403 So.2d 739 (1981)
Sharon W. LAMBERT and Donald Lambert
v.
MARYLAND CASUALTY COMPANY.
No. 10252.
Court of Appeal of Louisiana, Fourth Circuit.
June 15, 1981.
Rehearings Denied September 17, 1981.
*742 Klein & Rouse, Henry L. Klein, and Cecil M. Burglass, New Orleans, Arthur J. Lentini, Metairie, for plaintiffs-appellees.
Deutsch, Kerrigan & Stiles, Marian Mayer Berkett and Matt J. Farley, New Orleans, for defendant-appellant.
Fred Clegg Strong and Guy B. Scoggin, New Orleans, for intervenor-appellant.
Before SAMUEL, REDMANN, BOUTALL, SCHOTT and KLIEBERT, JJ.
SAMUEL, Judge.
Plaintiffs, Sharon W. Lambert and Donald G. Lambert, filed this suit against Maryland Casualty Company seeking $33,000,000 in damages caused by defendant's alleged wrongful attempt to take over and destroy their wholly owned corporation, Donald G. Lambert Contractor, Inc. Plaintiffs had personally guaranteed the indebtedness of the corporation to Maryland. The original petition alleged a conspiracy on the part of Maryland, The Bank of New Orleans & Trust Company (BNO), and Hibernia National Bank in New Orleans. The banks were not named as defendants in the original petition, but were added when Maryland's exception of nonjoinder of necessary parties was maintained by the trial judge. Defendants answered, denying any liability to plaintiffs.
Shortly before trial, judgment was rendered giving effect to a stipulation between plaintiffs and the defendant banks, dismissing the banks on all charges except the premature call of the notes owned by the corporation to them. Separate trials were ordered for the claims against Maryland and the banks.
After the trials were concluded, one judgment was rendered awarding plaintiffs $9,866,739.50 against defendant Maryland. The suit against BNO and Hibernia was dismissed.
Maryland appealed from that judgment. Plaintiffs also appealed insofar as the judgment dismissed the banks and allegedly failed to adequately compensate plaintiffs. However, plaintiffs subsequently dismissed their appeal. In addition, after rendition of judgment, the trustee in bankruptcy of plaintiffs' corporation sought to intervene in the trial court. The trustee's motion was denied by the trial judge, and the trustee appealed both as to the denial of the intervention and as to the judgment. Shortly before the date scheduled for argument in this court, plaintiffs filed a motion to dismiss the trustee's appeal. The motion was referred to the merits.
Plaintiffs' corporation was one of the largest highway construction companies in this state. Plaintiff, Donald Lambert,[1] through his corporation, developed a close *743 working relationship with Maryland, which eventually wrote all the corporation's public works bonds pursuant to R.S. 38:2241. In 1974 the corporation had approximately $30,000,000 in outstanding construction contracts bonded by Maryland.
During 1974 the corporation began to have financial problems, which plaintiffs' counsel attribute to slow cash flow resulting from high interest rates, excessive rain-caused work stoppages, increased oil prices, and a $13,000,000 retainage of progress payments by the State of Louisiana involving disputed contract payments.
The corporation reduced its outstanding indebtedness from $25,000,000 in late 1974 to approximately $9.5 million in October, 1975. In May, 1974 it was unable to continue to operate without additional cash. The two banks with which it had done business in the past, BNO and Hibernia, terminated the corporation's credit line and refused to lend more funds. At this time the corporation owed BNO $2,200,000 and Hibernia $547,000.[2]
Also at this time, the corporation had in excess of $22,000,000 in uncompleted public works contracts. In order to allow it to stay in business, Maryland agreed to guarantee new BNO loans up to $2,000,000 upon condition that the corporation and plaintiffs individually (1) recognize that the assignment of contract balances executed in individual indemnity agreements to hold Maryland harmless against bond losses were "executory" and (2) the corporation and plaintiffs individually furnish other collateral to secure the new loan and the loans already made by BNO. This agreement was executed May 31, 1974.
The company continued to be unprofitable,[3] and Maryland guaranteed a $250,000 promissory note held by Hibernia to prevent it from calling the company's entire indebtedness.[4]
During this period the corporation's other creditors began to demand payment, and in due course they made demands on Maryland under the payment portion of its public works bonds. The evidence is somewhat contradictory in this respect, but the record indicates demand letters in excess of $1,000,000 were received by Maryland, suits in excess of $300,000 were filed against the corporation and Maryland, and liens in excess of $500,000 were filed against the corporation's jobs. At the corporation's and plaintiffs' request, Maryland executed "release of lien bonds" to have these liens erased from the public records. As a result, the Louisiana Department of Highways released sums of money in its 125% lien reserve to the corporation, and Maryland's exposure accordingly was increased by the amount of the lien release bonds so furnished.
By August, 1975 the corporation again was in need of cash, and on August 20, 1975 the corporation and the individual plaintiffs executed an agreement with Maryland by which Maryland undertook to consider requests for cash advances up to $2,000,000 to be secured in part by the proceeds of a possible settlement of claims by the corporation against the Department of Highways. Maryland advanced $1.1 million under this agreement prior to October 1, 1975.[5] However, prior to the execution of this contract, the corporation had "rejected" a $2,000,000 settlement offer from the Department of Highways, with the result that the Department's attorney concluded all claims should be litigated.
In late September, 1975 the corporation had $10,000,000 in public works jobs unfinished, the bulk of which were represented by two jobs which the corporation had difficulty in completing. Maryland's outstanding liability continued to grow, and all signs indicated to Maryland's management that *744 the corporation was beyond financial rehabilitation. Maryland consequently decided to discontinue increasing its liability and to claim from parties to contracts it had bonded for the corporation the outstanding progress payments and other balances owed on completed work.
On October 1, 1975 Maryland informed the corporation it had decided to write no additional public works bonds for it, to execute no further releases of lien bonds, to make no further cash advances, and to file with the Department of Highways and other public agencies letters notifying them of Maryland's claim to the contract balances by way of assignment, subrogation, or otherwise. On the same day Maryland delivered such a letter to the Department of Highways.
As a result of the October 1, 1975 letter, the corporation's creditors withheld payments owed it and the corporation was unable to function. Maryland offered to finance certain jobs on a limited basis, but the offer was refused.
On October 14, 1975 the corporation filed a petition under Chapter XI of the Federal Bankruptcy Act.[6] It was allowed to continue to operate its business as a Debtor in Possession without supervision of a trustee. Nevertheless, it was unsuccessful in perfecting the Chapter XI arrangement with its creditors, and made an unsuccessful attempt to convert to a corporate reorganization under Chapter X of the Bankruptcy Act.[7] On its own petition, the corporation then converted the proceeding to a straight bankruptcy.
Numerous suits, counter suits, and other proceedings in state and federal courts have resulted, two of which have been determined by this court.[8] One such proceeding has given rise to an exception of res judicata by Maryland.
Maryland contends the present suit states the same cause of action against it as that asserted by plaintiffs in their reconventional demand in the prior suit entitled "Bank of New Orleans & Trust Co., et al. v. Donald G. Lambert, et al." The reconventional demand was dismissed primarily because defendants' attorney did not appear for the trial. This court held the trial judge did not commit error by dismissing the suit although a letter had been written to the trial judge advising that counsel was unable to attend the trial, since a number of previous delays had been given counsel for various reasons.[9]
In Louisiana res judicata (the plea is available under the provisions of Civil Code Article 2286) is stricti juris and a second suit is not barred when there is any doubt about the applicability of Article 2286.[10] It has been held that:
"A final judgment has the authority of res judicata only to those issues presented in the pleadings and conclusively adjudicated by the court, and where any doubt exists the second suit will be maintained."[11]
In Mitchell v. Bertolla,[12] the Supreme Court summarized the law relating to the issue of "identity of cause" and noted that under civilian law a judgment of dismissal only bars relitigation of matters actually pleaded and adjudicated and, unlike the common law doctrine of collateral estoppel or estoppel by judgment, does not bar matters which might have been pleaded. The *745 court (at page 292) made the following statement:
"We hold that the words `cause of action' in C.C. 2286 are to be interpreted to mean `cause', and we will look to civilian doctrine, if need be, to explain the meaning of `cause.'
O'Quin described the prevailing view of cause in actions to nullify an instrument:
'... each of the vices is a separate cause, and therefore failure of the plaintiff in an attack on the ground of fraud will not bar a subsequent attack on the grounds of error or duress, or any other vice. This view has been adopted by practically all the modern commentators.'"
Finally, in Scurlock Oil Company v. Getty Oil Company,[13] the Supreme Court explained the underlying principal against applying an overly liberal doctrine of res judicata as follows:
"... The doctrine is moreover compatible with the principle that freedom of access to the court is guaranteed by Louisiana's Constitution. `All courts shall be open, and every person for the injury done to him in his rights, lands, goods, person or reputation shall have adequate remedy by due process of law and justice administered without denial....' La. Const. Art. I, ¶ 6. This interest outweighs the argument that litigation should have an end."
The "cause" asserted in the reconventional demand was conspiracy between the various defendants in reconvention and an anti-trust violation. That cause was dismissed, and evidence of this kind was excluded by the trial court in this proceeding. This suit contains additional claims for wrongful seizure, negligence, breach of contract, and breach of suretyship duties. Moreover, the assertion of the direct damage to plaintiffs was made distinctly here and was not an essential element of the reconventional demand. Consequently, we conclude the cause of action asserted in this suit is not barred by the dismissal of plaintiffs' reconventional demand in the previous suit.[14]
Maryland further argues that plaintiffs have no right to proceed directly as stockholders of the bankrupt corporation against a party which allegedly caused damage to the corporation. The clearest Louisiana case on this point is Afeman v. Insurance Company of North America,[15] in which a 90% stockholder of a corporation, who performed almost all of its services, fell through a false ceiling as a result of the defendant's negligence and sued for loss of income to his corporation resulting from the disability he incurred in the accident. This court rejected his claim and stated that if "... a corporation sustains a loss then [other than a secondary action] only the corporation can sue to recover it." The basis for this court's decision was the distinction made in C.C.Arts. 435 and 436 between a corporate entity and the persons who comprise the corporation. This court refused to disregard the corporation's existence and award its lost profits as damages to its shareholder.[16]
In Orlando v. Nix,[17] the Supreme Court previously had held that when a corporate loss results from fraud or mismanagement by a corporate official, the right of recovery is an asset of the corporation and not of its shareholders. The court further stated that only "in extreme cases" is a shareholder *746 permitted to sue for damages owed to a corporation, and then not until the shareholder has made ineffectual demand on the corporation to institute suit. Such a suit must then be brought on behalf of the corporation which alone is entitled to the amount recovered.[18]
Plaintiffs cite Green v. Victor Talking Mach. Co.,[19] the basis of which is that a shareholder may obtain a personal right of action against a wrongdoer whose actions damage both the shareholder and his corporation provided there are "relations between him and the tort-feasor independent of those which the shareholder derives through his interest in the corporate assets and business." (quotation from page 381).
The special relationship upon which plaintiffs rely is their status as guarantors of corporate debts. By supplemental brief, plaintiffs attempt to establish a broader "special relationship" by what they characterize as Maryland's insistence on dealing with the Lamberts in "an individual and personal capacity." We see no difference between this phase and the Lamberts' status as guarantors. In Mullins v. First National Exchange Bank of Virginia,[20] the district court for the western district of Virginia expressly held that the status of guarantor of a corporate debt does not support individual action for damages allegedly done the corporation. The court stated (at page 722):
"The fact that plaintiffs were guarantors on the note executed by the corporation will not suffice to create a personal right of action independent of the harm suffered by the corporation."
Our reading of the jurisprudence leads us to the conclusion that plaintiffs should not be allowed to proceed individually as shareholders to recover for damages allegedly caused by defendant to the corporation. However, the Afeman case, which is the clearest pronouncement by Louisiana courts on the subject, does not involve a "special relationship" as that relied upon by plaintiffs. Because our jurisprudence is incomplete on this point, because of the result we reach on the merits, and because of its size and complexity, we prefer to decide this case on its merits. Accordingly, we proceed with a discussion of the substance of plaintiffs' claims.
Prior to a discussion of the merits of Maryland's appeal, we must dispose of the plaintiffs' motion to dismiss the appeal of the trustee in bankruptcy, and that appeal itself, since the questions thereby raised are entwined with plaintiffs' right to maintain this action as individuals.
The judgment here appealed from is dated September 20, 1978. On October 6, 1978 Maryland appealed suspensively and filed the appropriate security. On November 10, 1978 the trustee in bankruptcy filed a motion for permission to intervene and assert a petition for damages against Maryland. After a hearing, that motion was denied for the reason that Maryland's appeal divested the trial court of jurisdiction. The trustee then appealed devolutively from the order denying the intervention and from the judgment in favor of plaintiffs against Maryland.
In our view, the trial judge was correct in refusing to permit the trustee to intervene subsequent to this appeal by Maryland. At that time the trial had been completed, the intervention could serve no useful purpose, and the trustee's remedy, if any he had, was by appeal.
Subparagraph (6) of Code of Civil Procedure Article 2088 specifically retains jurisdiction in the trial court to grant an appeal to a party other than the first appellant and Article 2086, providing for third-party appeals, reads as follows:
"A person who could have intervened in the trial court may appeal, whether or not any other appeal has been taken." LSA-C.C.P. Art. 2086. *747 Consequently, we overrule plaintiffs' motion to dismiss the trustee's third-party appeal and proceed to the merits of that appeal.
The main thrust of the trustee's appeal is that the judgment of the district court should have been rendered in his favor and not in favor of the individual plaintiff stockholders because they have no right to sue for an alleged injury to the corporation in which they own stock. Referring to matters outside the record, he argues the bankruptcy court did not abandon the suit asserted by the plaintiffs in this case, and that plaintiffs should have prosecuted the suit as a shareholders' secondary action under Article 596 of the Code of Civil Procedure, which reads as follows:
"The petition in a class action brought by a shareholder or member of a corporation or unincorporated association because it refuses to enforce a right which it may enforce shall:
(1) Allege that the plaintiff was a shareholder or member at the time of the occurrence or transaction of which he complains, or that his share or membership thereafter devolved on him by operation of law;
(2) Allege with particularity the efforts of the plaintiff to secure from the managing directors, governors, or trustees and, if necessary, from the shareholders or members, the enforcement of the right; and the reasons for his failure to secure such enforcement; or the reason for not making such an effort to secure enforcement of the right;
(3) Join as defendants the corporation or unincorporated association and the obligor against whom the obligation is sought to be enforced;
(4) Include a prayer for judgment in favor of the corporation or unincorporated association and against the obligor on the obligation sought to be enforced; and
(5) Be verified by the affidavit of the plaintiff or his counsel." LSA-C.C.P. Art. 596.
The trustee also relies on the Afeman and Orlando cases[21] as authority for the contention that a shareholder may not sue for damages done the corporation unless such a suit is in the form of a secondary action on behalf of the corporation, and unless the corporation and the obligor against whom the obligation is sought to be enforced are joined as parties defendant. The trustee thus concludes the decision of the district court should be recast to substitute him, as trustee, for the individual plaintiffs, Mr. and Mrs. Lambert.
For whatever evidentiary value it may have in this regard, the record shows on June 14, 1976 plaintiffs' attorney wrote the trustee, supplied him with a copy of the suit against Maryland, and specifically requested that the trustee file a similar law suit on behalf of the bankrupt corporation against Maryland. The trustee took no action until judgment was rendered in favor of plaintiffs, at which time he attempted to intervene as stated above.
Our settled law is that in a third party appeal the third party appellant takes the record and the court proceedings as he finds them.[22] The record before us does not indicate precisely what rights were abandoned by the bankruptcy court. Moreover, there may be special defenses available to Maryland against the trustee which were not available to it against the individual shareholders.[23] Considering that the record does not contain evidence sufficient to justify a substitution of the trustee for the individual plaintiffs in this proceeding, the relief sought by the trustee must be denied.
On the merits of Maryland's appeal, the parties urge numerous relevant and nonrelevant charges and counter-charges against each other. However, it is clear from our analysis of the record, the briefs and the oral arguments that defendant's liability to *748 plaintiffs hinges upon a determination of the following questions:
1) Did the corporation assign to Maryland progress payments and other funds owed under the various jobs for which Maryland furnished public works bonds?
2) Did Maryland have the legal right to take the actions outlined above on October 1, 1975, and particularly the letter to the corporation's creditors, without the consent of either the corporation or the individual plaintiffs?
3) If Maryland had the legal right to take such actions, is it nevertheless liable to plaintiffs for a bad faith breach of a fiduciary relationship on an "abuse of rights" theory?
As these are basically questions of law and contract interpretation, the manifest error doctrine is inappropriate.
The first question already has been answered and decided by this court in another context. In Lambert v. Cronvich,[24] we concluded the documents executed by the parties did result in an assignment to Maryland of the contract proceeds. Lambert v. Cronvich includes a detailed discussion and analysis of those documents (at pages 557, et seq.) which need not be repeated here.
A detailed reference to the particular documents in the context of the issues presented establishes the existence of a valid and enforceable assignment and affirmatively answers the second question for our consideration, namely, whether Maryland had the right to take its actions of October 1, 1975, including issuance of the letter to the corporation's creditors.
In each bond application executed in connection with every bond written for the corporation by Maryland, the following language appears:
"And for the better protection of the said Company the undersigned do, as of the date hereof, hereby assign, transfer and convey to the said Company all our right, title and interest in and to all the tools, plant and equipment and materials of every nature and description that we may now or hereafter have upon said work, or in, on or about the site thereof, including as well materials purchased for or chargeable to said contract which may be in process of construction, on storage elsewhere, or in transportation to said site; hereby assigning and conveying also our rights in and to all sub-contracts, which have been or may hereafter be entered into, and the materials embraced therein, and authorizing and empowering said Company, its authorized agents or attorneys, to enter upon and take possession of said tools, plant, equipment, materials and subcontracts, and enforce, use and enjoy such possession upon the following conditions: This assignment shall be in full force and effect as of the date hereof should the undersigned fail to discharge any obligations of any description incurred in the performance of said contract, or be unable to complete the said work in accordance with the terms of the contract covered by said bond(s), or in the event of any default on the part of the undersigned under the said contract, or in the event of claim or default in connection with any other former or subsequent bonds executed for us or at our instance and request." (Emphasis ours).
Plaintiffs contend the above language cannot be read to mean that Maryland thereby was furnished with a perfected assignment. They argue a further condition must be met, namely default of the principal on the various contracts, and insist the corporation was not in default on the contracts involving Maryland.
However, in its letter of May 31, 1974 the corporation and the present plaintiffs agreed to the following:
"LAMBERT recognizes that the assignment of contract funds, materials, equipment *749 and rights in subcontracts made by LAMBERT to Maryland in the various indemnity agreements, heretofore executed by LAMBERT, are now executory. LAMBERT confirms the aforesaid indemnity agreements and the effectiveness of those assignments as of this date and agrees to execute, when called upon by Maryland, whatever documents may be required to evidence to third-parties the effectiveness of the assignment."
Counsel for plaintiffs argue this is not an assignment, and the trial court concluded that if this language is an assignment, it merely assigns the rights of the corporation to contract proceeds earned prior to the date of its execution on May 31, 1974. We disagree.
First, we conclude the language in the letter agreement of May 31, 1974, making "now executory" the assignments of balances due had the effect of waiving the condition in the various indemnity agreements which, according to plaintiffs, required a default on their part before the assignments could be executed.[24A] The contract of May 31, 1974 makes the assignment capable of enforcement unilaterally by Maryland without concurrence by the corporation or plaintiffs. The language by which the corporation and plaintiffs agree to execute "whatever documents may be required to evidence to third-parties the effectiveness of the assignment" was merely precautionary in nature and failure to obtain such documentation is not fatal or prejudicial to Maryland. Should Maryland have requested any of the Lambert interests to execute such documents, it undoubtedly would have been met with a resounding refusal. The law does not require the performance of a vain and useless act. Consequently, the agreement of May 31, 1974 makes the assignment provisions of previous indemnity agreements enforceable by Maryland.
In connection with this argument, plaintiffs contend the word "executory" does not mean capable of being executed, but on the contrary means incomplete, contingent, and unperfected. They cite as authority Black's Law Dictionary as follows:
"EXECUTORY. That which is yet to be executed or performed; that which remains to be carried into operation or effect; incomplete; depending upon a future performance or event. The opposite of executed.

"Right which is not vested but lies in action and which requires resort to court of equity to invest plaintiff with right claimed is `executory'. Parks v. Classen Co., 156 Okl. 43, 9 P.2d 432, 435."
The word "executory" is capable of two meanings in other states and of two meanings in Louisiana legal terminology. The American Heritage Dictionary of the English Language gives the following definition of the word "executory":
"1. Administrative. 2. Operative; in effect. 3. Law. Intended to go into effect, or having the potential of becoming effective at some future time; contingent."
This language seems to be based, as is the definition of "executory" in Black's Law Dictionary, on common law usage. At least one Louisiana case tends to give the word a similar meaning. In Whaley v. White,[25] the court held that a note and mortgage given to secure an oral promise of remarriage "ceased to be executory" upon remarriage and was then "an executed agreement."[26]
*750 However, other dictionaries[27] and legal usage in Louisiana have long referred to an "executory judgment" as one which is capable of immediate enforcement. Article 2781, et seq., of the Code of Civil Procedure provide a method for making a final judgment capable of execution in another parish, and the code clearly means that making a judgment executory has the effect of rendering it immediately enforceable. (See also Article 2167, Code of Civil Procedure.) A similar meaning was given to the word "executory" in Eiermann v. Modenbach,[28] in which the court stated a suspensive appeal prevents a judgment from becoming "executory" until the decision of the appellate court has become final.
While plaintiffs argue this ambiguity should be construed against Maryland because Maryland drafted the document, we are aware that the contract of May 31, 1974 was drawn in Louisiana by Louisiana lawyers for use and enforcement in Louisiana. The authority cited by plaintiffs is derived from a common law source. Moreover, the contract of May 31, 1974 obviously was intended to change the contractual status quo since rights were being granted and concessions made in that document. To construe the words "now executory" to mean "remain contingent" would be to defy common sense and reason, particularly in the context of the document's purpose of giving extra privileges to the corporation in return for the giving by the corporation and plaintiffs of extra security and other concessions to further guarantee Maryland from loss under its bonded indebtedness. We thus construe the words "now executory" to mean "now capable of execution" similar to the usage of the articles of the Code of Civil Procedure which provide for making judgments of another jurisdiction executory.
Second, we do not agree that the contract of May 31, 1974 had retrospective effect only. First, the indemnity agreement, quoted and emphasized above, applied to contracts then or thereafter confected. This language strongly denotes prospective effect. Second, the language quoted above from the May 31, 1974 letter including the phrase "heretoafter executed by Lambert" must be read in context with the language of the indemnity agreements and the third to last paragraph of the May 31 letter which reads:
"The undersigned recognize that the indemnity agreements heretofore or hereafter given by LAMBERT to Maryland are not modified or altered by any of the transactions contemplated by this letter, except to the extent that the indemnities are made executory as set forth in paragraph numbered 1 above." (Emphasis ours).
Third, the parties executed a letter agreement on August 20, 1975, some forty days before Maryland's letter of October 1, 1975. That August 20 document is on the letterhead of Donald G. Lambert Contractor, Inc., and is reproduced here:

DONALD G. LAMBERT CONTRACTOR, INC.

1800 Duncan St.  Kenner, Louisiana 70062  XXX-XXX-XXXX

August 20th, 1975
Maryland Casualty Company
Post Office Box 51178
New Orleans, Louisiana 70151
Gentlemen:
Donald G. Lambert Contractor, Inc., and its affiliated firms and controlling stockholders, Lambert Industries, Inc., Lambert *751 Construction Company, Inc., Lambert Aviation, Inc., Donald G. Lambert and Sharon W. Lambert (Collectively referred to in this letter as "LAMBERT") your indemnitors and assignors, hereby request that you, Maryland Casualty Company, assist LAMBERT, who is in immediate need of cash, by advancing from time to time, as needed by LAMBERT, cash funds not to exceed in aggregate $2,000,000.00. Donald G. Lambert is authorized to act for LAMBERT in requesting the individual advances. Maryland Casualty Company will not be obligated to grant the requests of LAMBERT to advance funds but may in its sole discretion grant or refuse each or all of LAMBERT'S requests to advance as Maryland may elect. However, should Maryland elect to advance any sums to LAMBERT, LAMBERT agrees as follows:
(1) The funds made available by Maryland will be used only for the purposes designated or indicated in LAMBERT'S request for them. It is contemplated that Maryland will only entertain requests for advances to meet LAMBERT'S payrolls, for payment of subcontractors, suppliers and rents arising out of and in connection with any LAMBERT construction contract, and for overhead items such as taxes, salaries, general office expense, interest on loans incurred by LAMBERT, installments due on notes secured by real estate or chattel mortgages on equipment purchases made heretofore.
(2) The advance made by MARYLAND under this letter agreement shall be repaid on or before January 30th, 1976. The maturity date may be extended by MARYLAND without consent of, consultation with, or notice to the indemnitors herein.
(3) LAMBERT recognizes that MARYLAND is not bound to execute and/or to issue any additional bonds for LAMBERT, or for any of the persons included in that collective reference, but will consider requests for the execution and issuance of additional bonds as applications are made and MARYLAND reserves the right to refuse, in whole or in part, such applications.
(4) Under the existing executory assignment heretofore made by LAMBERT on March 31, 1973 to MARYLAND, which the parties reconfirm, MARYLAND has an assignment of all funds recovered by or to be recovered by LAMBERT in connection with any construction contracts of LAMBERT, or any of the persons included in that collective reference. LAMBERT anticipates that within a short period of time, it may recover substantial sums on claims and suits for extras and damages now pending against the State of Louisiana and other governmental bodies, which claims do in fact arise out of said construction contracts. If recovery is effected, LAMBERT will pay the sums recovered directly to MARYLAND first to the repayment of any advances MARYLAND may make under this letter agreement.
(5) The undersigned recognize that the indemnity agreements heretofore or hereafter given by LAMBERT to MARYLAND are not modified or altered or extinguished by any of the transactions contemplated by this letter.
(6) The undersigned warrant that the signatories to this letter are fully authorized to act in the capacity or capacities in which they appear and for the purposes set out herein and attach evidence of their corporate authority.
*752 
(Emphasis added by the Court).
These documents and our decision in Lambert v. Cronvich,[29] amply demonstrate the assignment by the corporation was to be prospective in effect and was not limited to funds earned as of May 31, 1974.
From all of the above, we conclude the assignment given to Maryland by the corporation had legal effect as of October 1, 1975, and Maryland had the legal right to take the action outlined above on that date, including the letter notification, to persons owing money to the corporation, of its demand for payment.
Additionally, even if Maryland did not have the benefit of a contractual assignment, it had the right to claim funds due the corporation on the various outstanding contracts which it had bonded by legal subrogation. This point was decided long ago in Prairie State Bank v. United States,[30] in an opinion written by Chief Justice White. In that case the Supreme Court of the United States held a surety on a public works bond is entitled to the contract balance by legal subrogation through the owner's rights, whether or not an express assignment had been executed by the contractor, and even though the money may be attributable to work done by the contractor prior to default. The court explained that the contract balances were the security which the owner held to secure faithful performance by the contractor of the work to be done. If the work was not faithfully completed, the owner had a right to withhold payment of the funds. When the surety, in conformity with its bond obligations, provided the owner with full performance of the contract after the contractor's default, then the surety became subrogated to all the rights of the owner, including the right to hold the contract funds as security for its own losses.[31] The Supreme Court reiterated its decision in Prairie State Bank in the later case of Pearlman v. Reliance Insurance Company.[32]
At least two federal cases originating in Louisiana recognize the position of the surety *753 with respect to contract funds. In Claiborne Parish Sch. Bd. v. Fidelity & Deposit Company of Maryland,[33] the court recognized that a surety needs no assignment to the contract funds, holding the surety is entitled to the funds by the right of subrogation if called upon to pay any claims. This decision was maintained in U. S. Fid. & Guar. v. Housing A. of Town of Berwick.[34]
Plaintiffs argue subrogation is not appropriate in the present case because the corporation, although bankrupt, was not in default on October 1, 1975. While there was no formal recordation of default of the various construction contracts, there was clearly default on the bonds and actual default on the construction contracts themselves.[35] Subrogation takes effect under the provisions of the indemnity agreement when there has been a claim or a default of the contract.[36] Louisiana public works bonds are statutory in nature[37] and not only guarantee performance of the construction work but also payment of laborers and materialmen.[38] Between March and October 1, 1975 claims in excess of $1,000,000 were asserted against defendant by letter, lien, or suit, and these claims represented unpaid laborers, materialmen, and subcontractors on the various bonded jobs undertaken by plaintiffs' corporation. This demonstrates the corporation, as principal on the bond, was in default on the payment portion of that obligation. The corporation admitted the validity of over $380,000 of the claims, and requested Maryland to pay claims of $302,434 and $79,902 asserted under R.S. 38:2241. One claim of $6,471 against the corporation and Maryland was reduced to final judgment which Maryland had to pay. The corporation admitted in its petition under Chapter XI of the Bankruptcy Act that it had unsecured creditors in an aggregate amount of $2,324,447.38, and that $1,100,000 of this amount possessed lien rights under various contracts.[39]
Defendant remains exposed to the claims of the lien holders and is entitled under its right of legal subrogation to protect itself against potential liability by asserting an interest in the funds given to indemnify it against loss.
It has been held that exposure to claims under payment obligation of a public works bond is sufficient in itself to justify a surety's notification to the owner under a public *754 works contract of its interest in the contract balances. In United States Fidelity & Guaranty Co. v. Triborough Bridge Authority,[40] the court said:
"A failure by the contractor to pay for labor and material was just as much a failure to perform and carry out the terms of the contract as an abandonment of the work would have been."
A similar decision was rendered in Gerstner Electric Company, Inc. v. American Insurance Co.,[41] in which a surety, after becoming aware of a single claim for labor and materials by a subcontractor, directed the owner to withhold further payments from the contractor even though the contractor had not been declared in default by the owner, had not admitted default, and disputed the validity of the subcontractor's claim. The court upheld the trial court, concluding the surety had acted reasonably under the circumstances. In Fireman's Fund Insurance Company v. United States,[42] a surety demanded the contract balances because one supplier had filed suit against it and the contractor. The contractor contested the supplier's suit, but the court nevertheless held the owner liable to the surety for a payment made to the contractor after the owner received the surety's notification of its claim to the contract balances. Other cases also have upheld the right of a surety to protect its interest in the contract balance prior to formal recordation of default.[43]
Having concluded the existence of the assignment, its effectiveness on October 1, 1975, and Maryland's subrogation rights, we must now decide whether Maryland, while having the legal right to do so, nevertheless committed a breach of faith and broke a fiduciary relationship by sending the letter of October 1, 1975 to the corporation's debtors, thereby effectively freezing the funds of the corporation and forcing it into bankruptcy.
When in May, 1974 Maryland became a guarantor of the $2,000,000 owed to BNO and subsequently for the $250,000 owed to Hibernia, it took on an obligation over and above those owed as surety. Furthermore, in August, 1975 Maryland agreed to advance Lambert up to $2,000,000 and did in fact advance 1.8 million dollars under this agreement, so that by October, Maryland occupied the positions not only of surety, but also of guarantor and direct creditor of Lambert.
The conclusion of the trial judge that Maryland was a fiduciary with regard to the corporation and owed it a duty of acting in good faith is an over simplification. That corporation, as principal on the public works bonds, made certain indemnity agreements which were unilaterally enforceable both prospectively and retrospectively by written agreement. We also note Maryland has a duty to its shareholders, and perhaps to its creditors, to manage its business in a prudent manner in order to avoid jeopardizing the corporate entity, the equity interest of its shareholders, and the right of its creditors to be paid amounts owed by it.
We cannot construe the action of Maryland as being in bad faith or in violation of any fiduciary relationship to the corporation. Maryland was under no legal obligation to furnish additional public works bonds; it was under no legal obligation to furnish additional releases of lien bonds; and it had no obligation to make further direct cash advances to or for the benefit of the corporation. Maryland did not lull the corporation into a "false sense of security" by the agreement of August 20, 1975, quoted above in its entirety, since the opening paragraph of the agreement clearly establishes that "Maryland Casualty Company *755 will not be obligated to grant the request of LAMBERT to advance funds but may in its sole discretion grant or refuse each of all of LAMBERT'S requests to advance as Maryland may elect." (Emphasis added). Consequently, the corporation and the plaintiffs were put on notice by this language that Maryland did not guarantee it would advance all or any part of the $2,000,000 cash advance requested by the corporation and plaintiffs.
Plaintiffs argue that had they known Maryland would cease to advance funds and otherwise take action to protect its interests as of October 1, 1975, they could have obtained another bonding source to allow the corporation to remain in operation without the benefit of Maryland's bonding capacity. The testimony offered in this regard is not disputed. However, we cannot ignore the fact that less than two weeks after Maryland's actions the corporation applied to the bankruptcy court for relief under Chapter XI of the Bankruptcy Act, and it was allowed to continue operation as Debtor in Possession without the burden of a trustee to second-guess or otherwise interfere with its operations. If the corporation or plaintiffs actually had access to other bonding capacity they certainly would have used the same while entrenched as Debtor in Possession in order to rescue the corporation from its financial difficulties. Furthermore, they would not have accepted the onerous obligation imposed on them in the agreements of May 31 and August 20, in order to get additional cash. These circumstances establish that even had Maryland not taken its action on October 1, the corporation still would not have survived financially.[44]
We agree with the trial court's conclusion that Maryland intended to cut off its financial support to the corporation with the full knowledge that such action would effectively place the corporation in bankruptcy. However, we do not see in this a breach of good faith or of a fiduciary violation since we know of no law requiring even a surety company much less a guarantor and creditor to continue to put additional money into a corporation which it reasonably believes is in a financially hopeless condition, once it has legally obtained the right to take whatever actions are necessary to cease operations in connection with such a corporation.
Having concluded there was no violation of a fiduciary duty and no lack of good faith, we must determine whether Maryland actionably abused the rights we have decided it possessed on October 1, 1975.
The doctrine of abuse of rights is essentially that "fault" in the delictual sense can be imposed upon a party who attempts to exercise a right legally given it with the intention of harming or imposing a detriment upon another. Commentators have explained the doctrine as follows:
"Briefly summarizedif a person exercises his rights with a predominant intent to harm, as evidenced by the fact that he obtains little or no benefit from the exercise of his rights while, at the same time the other party or parties suffer damages thereby, most courts in civil law jurisdictions will find the act abusive, an abuse of rights. They will not enforce it, or will award damages to the injured party, or will order that what was done be demolished, modified, or if possible, undone."[45]
The doctrine of abuse of rights also has been stated as follows:
"... Louisiana, like France, in difficult cases where the exercise of a right is challenged, appears to seek the raison d'etre of the rightwhat is it for?Why has the law provided it? If the exerciser of the right has acted within the ambit of purpose, he is protected even though the exercise entails inconvenience to others. But if the exercise of the right is abnormal, *756 not benefitting its purposethen the good jurist, recognizing with Celsus that law is the art of good and of equity will strive to make his decision just and good insofar as he can."[46]
There is a paucity of jurisprudence in Louisiana dealing with the abuse of rights doctrine. The primary case is Higgins Oil & Fuel Co. v. Guaranty Oil Co.,[47] a suit by one land owner against another land owner seeking to have the defendant cap a dry oil well drilled on its property. The defendant's oil well, while uncapped, was letting air into an underground cavity, preventing plaintiff from obtaining enough suction to pump oil from the plaintiff's well. The court reviewed numerous French commentators and concluded that cases of this nature involving conflicting rights must be predicated on their own facts and circumstances, and no broad or inflexible rule can be set forth. However, the court formulated, in somewhat unsatisfactory fashion, the rule that one neighbor in an "unneighborly spirit" must not do something which creates no benefit to himself but which causes damage to his neighbor. The court stated that while the defendant had the right to drill on his land and to allow the well to remain uncapped, nevertheless when the uncapped well accomplished no benefit to the defendant and simultaneously caused damage to the plaintiff, the plaintiff was entitled to injunctive relief requiring defendant to cap the well. In short, the court seemed to be saying that an abuse of right exists where one exercises a right to which he is otherwise entitled when the exercise of that right causes him no benefit while at the same time causes detriment to another. This rationale is somewhat similar to the doctrinal material quoted above.
Another case based on the abuse of rights doctrine is Onorato v. Maestri.[48] In that case plaintiff, a real estate broker, negotiated a lease and agreed to accept his commission in installments. Prior to the payment of all installments of his commission, the lessors went into receivership in violation of the lease and the lessee used this receivership to rescind the lease contract. The defendant lessors contended because the lease was rescinded it never existed and therefore the plaintiff real estate broker was never entitled to a real estate commission. However, immediately after rescinding the lease the lessors entered into another lease with the receiver under the same terms and conditions contained in the original lease prior to its dissolution. The court said that unquestionably defendants had the right to rescind the lease upon the appointment of a receiver as provided in the lease contract. Had they done this and nothing more, or had the rescinded the lease and subsequently leased the property to a third person the court indicated it would be inclined to hold the agent not entitled to recover, at least to the extent of commission payments due after the rescission, because his right to a commission depended upon the collection of rental from the leased property until his commission was satisfied. However, by executing the identical lease with the receiver, the lessors in effect reinstated the original lease to the extent of the time period named in the lease with the receiver which covered all or most of the time in which the plaintiff was interested. To allow the defendant lessors to so avoid their obligation would be a subjugation of substantive rights to matters of mere form. The reasoning of the court was that, by exercising their right to rescind and re-leasing the property on the same terms and conditions to the legal representative of the original lessee, the defendants obtained no benefit for themselves and at the same time caused detriment or harm to the plaintiff agent.[49]
*757 An analysis of these Louisiana cases which touch upon the abuse of rights doctrine shows that, depending on the facts and circumstances of each case, for one to be held in damages for exercising a right legally conferred upon him there must exist (1) no benefit to the person exercising the legal right, and (2) damage or injury to the person against whom the legal right is asserted.
This analysis was confirmed by the Louisiana Supreme Court in the recent case of Morse v. J. Ray McDermott & Co., Inc.,[50] in which the court established the test for the existence of an abuse of rights is whether the party exercising the right had "legitimate and serious interest" in its exercise. Thus, merely possessing a right does not justify its exercise if that exercise injures another. The party exercising the right must have an interest in doing so and that interest must be legitimate and not feigned.
In the present case, unquestionably plaintiffs, as guarantors of their corporation, sustained damage by the exercise of Maryland's right on October 1, 1975. However, by exercising its rights, Maryland gained a distinct and obvious advantage in protecting its legitimate and serious interests. It limited its liability under its suretyship arrangements and as a guarantor and creditor and prevented its corporate assets from being further depleted by investing money in a corporation which reasonably was beyond financial resuscitation. A distinct benefit having been gained by Maryland from the exercise of its rights on October 1, 1975, the abuse of rights doctrine is not applicable, and Maryland is not liable in tort to plaintiffs.
It should be noted that in brief even plaintiffs agree Maryland did not act with the intention of destroying plaintiff's corporation. On the contrary, plaintiffs concede Maryland's actions were more motivated by a desire to control and dominate the operations of the company than by an intent to destroy. Considering the indebtedness undertaken by Maryland, we do not see that a motivation to control and dominate for the purpose of financial rehabilitation is unreasonable under all the circumstances here. This is amply demonstrated by the fact that even after Maryland issued its letter of October 1, 1975, it still offered to plaintiff the right to continue his business under certain circumstances, primarily involving supervision and control of his actions by Maryland or its representatives. Plaintiff rejected this offer and eventually the corporation went into bankruptcy.
Given all the facts, the legal rights exercised by Maryland, and the protection of its serious and legitimate interests Maryland received by exercising its legal rights, we conclude the abuse of rights doctrine, as applicable in Louisiana, does not justify an award of damages against Maryland for protecting itself by exercising the legal rights acquired by it by contract and by operation of law.
For the reasons assigned: Plaintiffs-appellees' motion to dismiss the appeal taken *758 by the trustee in bankruptcy is overruled. On the merits of the trustee's appeal, there is judgment in favor of the appellees and against the appellant. On the merits of the appeal taken by Maryland Casualty Company, the judgment appealed from by Maryland Casualty Company is reversed and there is judgment in favor of defendant-appellant, Maryland Casualty Company, and against plaintiffs-appellees, Sharon W. Lambert and Donald Lambert, dismissing their suit against Maryland Casualty Company; costs in the trial court are to be paid by defendant-appellant; costs in this court are to be paid by the plaintiffs-appellees.
MOTION OVERRULED; REVERSED.
REDMANN, Judge, dissenting.
The record permits the trial judge's inference that Maryland Casualty deliberately and without justification destroyed Lambert Construction Co., Inc. It is beyond our authority, on appellate review, to substitute our reasonable factual inferences for those of the trial court.
The difficult question of whether the two sole corporate shareholders can recover for what was basically damage to the corporation is answered by the trial judge's reasons for judgment, but deserves further response. The point critical to an understanding of the trial judge's award to the shareholders is that, had the corporation's trustee sued Maryland, the award would have been higher than $9,000,000 by the total of all debts owed by the corporation: the $9,000,000 awarded would have been the remainder after payment in full of all corporate creditors. That $9,000,000 remainder would by undisputed law have been distributed either to the shareholders if the corporation were in liquidation or else to the now debt-free corporation and thus the shareholders would benefit to that amount.
It must be conceded that the shareholders surely do not have the right to sue on behalf of the creditors. Equally sure is that a corporation's creditors enjoy a priority over the shareholders. In this case, however, the shareholders are no longer in control of corporate action and the person who is, the trustee in bankruptcy, declined to sue Maryland. The creditors, through the trustee, may forego their own entitlement to recover from Maryland, but they cannot prevent the shareholders from recovering their own losses. The reasoning supporting the individual plaintiffs' recovery here is that, but for Maryland's action, the corporation would not only have paid all of its creditors and survived but also, as one of the largest highway constructors in the state, would have been worth, after payment of all its debts, over $9,000,000 to its shareholders.
The damage that the trial court found Maryland did is thus more than $9,000,000 although $9,000,000 is all that would have been left after payment of all creditors and is therefore all that these plaintiffs are entitled to recover. But that amount is plaintiffs' recovery for plaintiffs' damages, and there is no hint by Maryland or the trustee that Maryland does not have enough money to pay the full amount of damage it caused to the corporation so that plaintiffs' recovery does not deprive the trustee of one cent of that part of the corporation's possible recovery that would pay off the creditors in full. Thus the priority of the destroyed corporation's creditors is not affected by the trial court's judgment, which, for the trial judge's reasons appended hereto, should be affirmed.
 APPENDIX
 TWENTY-FOURTH JUDICIAL DISTRICT COURT
 PARISH OF JEFFERSON
 STATE OF LOUISIANA
NO: 196-638 DIVISION "F"
 SHARON W. LAMBERT and DONALD G. LAMBERT
 VERSUS
 MARYLAND CASUALTY COMPANY

REASONS FOR JUDGMENT
This is a damage action brought by Donald G. Lambert and Sharon W. Lambert against Maryland Casualty Company, the Bank of New Orleans and Hibernia National Bank. The trial of this case was severed as to the Bank of New Orleans and the Hibernia National Bank and this action was dismissed as to those parties after the trial *759 of the limited issues involving the Banks. The issues between the Lamberts and Maryland Casualty Company were taken under advisement and the matter has been briefed voluminously. Additionally, the Court has had the advantage of considerable education in two related and interwoven cases, #184-822 (BNO -vs- Lambert) and #196-918 (Lambert -vs- Cronvich). The Court is now ready to rule on this damage suit.
Donald G. Lambert and Sharon W. Lambert are the sole shareholders of Donald G. Lambert Contractor, Inc., a corporation which has been adjudicated bankrupt by the United States District Court in bankruptcy action number 75-2041. By order dated November 30, 1976, the Bankruptcy Court abandoned any rights the corporation had for damages against Maryland Casualty Company in favor of the Lamberts. The Lamberts claim that the corporation was bankrupted and destroyed by certain action taken by Maryland Casualty Company on October 1, 1975, when, without warning, Maryland Casualty Company observed upon the Department of Highways, and other governmental agencies, certain "letters" in which Maryland made claim to the Lambert Contractor's progress payments, and requested that all future payments "be paid solely to Maryland Casualty Company."
The Lamberts' cause of action, after several amendments, is couched in various theories, including wrongful seizure, negligence, breach of agreement and breach of fiduciary duties owed by Maryland to the Lamberts. The Court sees the case as one for wrongful conduct under Louisiana Civil Code, articles 2315 and 2316, and for breach of the contractual and quasi-contractual relationship between the parties.
Maryland pitches its defense on the proposition that it had the right to take the action it did on October 1, 1975. The Court cannot agree.
For many years, Maryland Casualty Company bonded Donald G. Lambert Contractor, Inc. on various highway jobs. Maryland received, in connection with those bonds, the individual indemnities of Donald G. Lambert and Sharon W. Lambert, who were individuals of unusually substantial means. By indemnifying Maryland, plaintiffs had a substantial interest in seeing to it that Maryland would never suffer a loss on any bonds it wrote and by the size of the Lamberts' personal estate, Maryland had security seldom given by individuals.
In early 1974, however, interest rates, an embargo by the OPEC nations, and bad weather combined to give Lambert cash-flow problems, an unenviable situation experienced by most general contractors and many large corporations. At this time, Donald G. Lambert went to Baltimore, Maryland to discuss his overall situation with Maryland Casualty Company. As a result of that meeting, Lambert was asked to reduce his contract workload and to submit to examination by a Maryland consultant. The consultant was a William Hildebrandt and Mr. Hildebrandt gave Maryland a report generally favorable to Lambert. The end result was that the Bank of New Orleans (which was then owed $2,500,000.00 on an open, unsecured credit line) agreed to advance an additional $2,000,000.00 and to extend the old credit. Lambert, on his part, gave all of the parties a mortgage on all of the real estate he owned, as well as his movables, life insurance, etc. After negotiation between all parties, the agreement was reduced to writing on May 31, 1974. That agreement required the parties to meet on a subsequent date and execute security documents.
On August 5, 1974, Lambert (individually and on behalf of his companies) signed many security agreements, including various assignments of accounts receivable. Those assignments of accounts receivable specifically excluded monies due on Lambert's bonded jobs, which were assigned already "in the indemnity agreements" with Maryland and were thereby pledged to secure Maryland against losses occasioned by their having issued bonds. Maryland's Fred Duduck praised Lambert for personally pledging "his entire net worth" and stated in his report that: "for this dedication, we owe him our every consideration." (P-a-6). *760 Other Maryland personnel were generous in their praise of Lambert and throughout the litigation, no one has seriously questioned Lambert's integrity, devotion, or ability as a contractor.
Several months after the execution of the security agreements on August 5, 1974, however, Maryland apparently decided it needed yet another "assignment". Specifically, Maryland wanted Lambert to execute letters prepared on each individual job, acknowledging that Maryland Casualty Company had the right to receive progress payments directly. Those specific assignment forms were forwarded by Maryland's counsel to Lambert's counsel on December 18 and 27, 1974. (P-o-9 and P-o-11). During the interval from August 5 to December 27, however, Lambert was diligently working on all jobs where weather permitted and his progress in reducing the overall workload was impressive. (P-x-1). In essence, Lambert was keeping his promise to Maryland and eliminating their exposure at a pace that would reduce the workload from approximately $25,000,000 to $9,000,000 in less than 18 months.
Lambert testified that, in effect, he did not understand why, in December, Maryland wanted him to sign letters allowing Maryland to claim his funds directly, and upon being presented the letters for his signature, he refused on two grounds. First of all, he was not in default on any jobs nor any other obligation either to Maryland Casualty Company or the Banks. It was Lambert's feeling that there had to be a default under the indemnity agreements before any "assignment" would be triggered in favor of Maryland. If Lambert had signed the letters prepared by Maryland's counsel, the requirement of "default" might have been eliminated and Maryland might have had the right to claim contract funds without any reason. Lambert therefore refused to sign the letters. Later testimony by BNO president, Lawrence Merrigan corroborated Lambert's feeling that the security devices were given to protect the parties only if Lambert defaulted.
Additionally, Lambert telephoned Price Hayden of Maryland Casualty Company and advised him that the letters of assignment had been presented to him, and that in addition to his objecting to the letters when all jobs were progressing properly, he (Lambert) felt that the execution of such letters could be misinterpreted by materialmen and suppliers as some sort of default. Maryland did not press Lambert further for his signature on these letters and the Court believes that at that time, Maryland either agreed with Lambert or decided to approach their need for specific assignments another way. Maryland's John Long, an attorney in his own right, testified at trial and admitted that in his opinion, Maryland needed Lambert's signature in order to perfect an assignment of those receivables and that accordingly, the letters were specifically drawn for Lambert's signature. The law and evidence support Mr. Long's conclusion. Lambert's rights to progress payments were "incorporeals" which require certain formalities in order to be transferred from one party to another. La.C.C. Article 2642 requires the "giving of title" as does La. C.C. Article 2481. Sheffield v. Norris, 235 La. 667, 105 So.2d 260; Scott v. Corkern, 231 La. 368, 91 So.2d 569 and other cases cited by plaintiffs indicate that "[i]t is essential to the validity of an assignment of a right or claim to a third person that the transferor deliver a title to the transferee." Accordingly, without the specific written assignment which Maryland tried to obtain in December of 1974, Maryland had no rights to the contract funds on October 1, 1975, and was well aware of the need for Lambert's signature on some sort of "assignment of accounts receivable." During the trial, Maryland's Price Hayden was specifically asked whether he (and therefore Maryland) realized, prior to October 1, 1975, what result the making of such a claim would have, and he frankly answered that he realized that it would "put Lambert out of business."
Maryland argues in its brief, however, that even without a specific assignment, it had the right to claim the Lambert contract funds under a theory of "equitable subrogation." *761 The Court has examined the myriad of cases cited in support of this theory and notes that the facts of those cases are distinguishable in one important and material aspect: default, formal or constructive. In most cases, the bonding company does not take over a contractor's jobs until there has been a formal declaration of default by the owner; or an admission or acknowledgment by the contractor that he cannot complete the jobs; or an abandonment by a contractor of his obligations under the bonded contracts.
In Lambert's case, the evidence is clear that Lambert was not in default on any obligation under his contracts. None of the jobs had been abandoned and many had been completed since May of 1974, with several more on the verge of completion. Accordingly, Maryland's reliance on "equitable subrogation" is factually misplaced. Maryland had not been called upon to take over any jobs under the "performance" section of the bonds, or pay any claim under the "payment" provision of the bonds. The surety contract indemnification agreement signed by Lambert makes it clear that the surety has no rights absent a default or claim under the bonds. The Court's independent research has revealed an excellent article entitled "A Surety Lawyer's Viewpoint," 2 Public Contract Law Journal, 79, at 82-83 (1968).
"The surety is under a dutyand this is not well understood by obligeesnot to commit an act prejudicial to the rights of its principal. The bond application agreement is not a contract of `peonage' and it does not establish a `master-servant' relationship between the surety and its principal. The surety is not the alter ego of its principal and the surety does not have unilateral power to issue orders or directives to its principal on how and when to perform the construction contract. The obligation, prior to default, to perform work and pay accounts belongs exclusively to the principal. The surety will not, therefore, intervene in disputes between the principal and third parties in advance of a default by the principal of its obligations. This does not mean that the surety is without remedies against a misbehaving principal who is not yet in default. In extraordinary circumstances, where the surety has just cause to believe that its rights as surety are being imperiled by the conduct of its principal, such as by diversion of jobs, funds, unpaid job accounts in large sums and unsatisfactory job progress, the surety may, in advance of an announced default, bring an action quia timet against its principal to compel correct conduct."
The Court finds that, as a matter of fact, Maryland did commit an act prejudicial to the rights of its principal by knowingly making a claim which it knew would tie up, or "freeze" Lambert's cash flow and put his firm "out of business". As anticipated by Price Hayden (and as should have been foreseeable), the so-called exercise of rights of "equitable subrogation" caused the Department of Highways to pay no one, thereby placing Lambert in a cash-flow crisis.
Certainly, this is not a case of "extraordinary circumstances: where the surety can take pre-default action to protect itself from a "misbehaving principal" who might be diverting job funds or wrecklessly abandoning projects. But even if Maryland has such rights, those rights should have been asserted judicially by an action quia timet, or its Louisiana alternative, a suit for declaratory relief.
The action quia timet is equitable in nature, as is Maryland's defense that it was acting under a theory of equitable subrogation and allows the surety company, when it fears some future probable injury to its rights and interest, to seek appropriate judicial relief. Such an action in equity would be brought before a default, when no "legal remedy" might exist. Under Louisiana's declaratory judgment statutes, contract rights can also be adjudicated prior to default (La.C.C.P.1873) and the Court does not find, factually, that Maryland had any reason to fear that Lambert was diverting funds or failing to perform his obligation under the bonds. To the contrary, Lambert had his entire "net worth" to lose before *762 the bonding company would be threatened. That personal net worth had reached $9,612,376.30 by June of 1974, and was sufficient incentive to keep Lambert working diligently on the jobs. Maryland simply was not in danger, and the Court finds that Maryland's reliance on "equitable subrogation" is not supported by the facts.
Maryland makes much in its brief about liens filed and certain bills that were unpaid. The majority of the liens, however, involved disputes between Lambert and materialmen over the validity of claims and certainly do not, per se, give Maryland the right to take over the contracts. It would be a rare contractor who didn't get involved in good-faith disputes over bills he presented. In such cases, the contractor and the bonding company can "bond out" the lien and litigate the issues in the materialman's subsequent action to enforce his lien. Testimony at trial indicated that Maryland is presently litigating with various claimants and asserting some of the same defenses which Lambert asserted before October 1, 1975. In all instances but one, moreover, Lambert provided Maryland with a defense by supplying legal counsel and undertaking to litigate disputed lien claims at his own expense. The one exception was a default judgment which was taken by Farris Curbing against Lambert and Maryland Casualty Company in the sum of $6,471.00. The Court finds that this was inadvertent and that Lambert did not intend to let that plaintiff take a default. But in no event can a $6,471.00 default judgment justify the wholesale seizure of all contract funds on October 1, 1975. Moreover, the Court does not believe that the Farris Curbing default judgment, or the liens filed by materialmen on disputed claims, or the existence of certain unpaid bills, or any combination of these three was the real reason for Maryland's action on October 1, 1975.
The Court is convinced that Maryland's actions were motivated by Maryland's desire "to issue orders and directives to its principal" on how to run its business. Stated another way, Maryland decided to dictate to Lambert on matters that dealt with how Lambert ran his own company. On August 18, 1975, Price Hayden wrote a memorandum to John Long, calling for Lambert to sell certain equipment, cut salaries (including his own) and to settle certain claims against the Department of Highways, among other things. The evidence is that Lambert was doing his best to comply. The Court rejects Maryland's in-brief contention that Maryland was exercising its rights of "equitable subrogation" because it feared losses. This case is unique in that it is one where a willing and capable contractor was forced off jobs by a surety company.
The Court cannot ignore certain events which took place after October 1, 1975. Specifically, meetings were held wherein Lambert requested that the funds at the Highway Department be freed so as to allow him to finish his own jobs. Lambert had the greatest interest in finishing his own jobs. By taking action it perceived would "put Lambert out of business", Maryland fatally prejudiced Lambert's rights and destroyed his company. The Court believes that Maryland's action was calculated and that its results were foreseeable:
"It is common knowledge that contractors rely upon contract proceeds administered through progress payments to properly finance the contract." Royal Indemnity v. U. S., 208 Ct.Cl. 809, 529 F.2d 1312 (1976).
On October 8, 1975, Maryland presented Lambert with a document under which Lambert would be "permitted" to finish certain jobs with Maryland's "assistance". This "assistance" would amount to release of the funds Maryland claimed on October 1, 1975. In preparation of this document, Maryland wanted Lambert to admit default, recognize Maryland's right to do what it had already done on October 1st, agree to a liquidation sale of equipment, give Maryland voting power through powers of attorney and/or proxies, and resign as director of the company.
Lambert refused to sign the document, and the Lambert cash-flow remained frozen *763 until October 13, when the next critical event took place. On that date, BNO's president, Lawrence Merrigan, advised Lambert personally that the bank was calling all of the notes, amounting to a call of over $4,500,000.00 and that payment was being demanded "by 2:00 p. m." on October 14. These notes, however, were not due until November 30, 1975, by agreement of all parties and it is this "premature call" that formed the basis of the Lamberts' suit against BNO. In testifying on the October 14 call, however, Merrigan made it clear, and the Court so finds, that had Maryland not taken its October 1 action, the notes would not have been called. In fact, both Merrigan and Beauregard Redmond, then a vice-president at the BNO (now the president of the Commercial Bank and Trust Company expressed great surprise at Maryland's action. Merrigan certainly did not understand the security documents to give Maryland the right to act prior to default and neither Merrigan nor Redmond was able to point to any default on Lambert's part prior to October 1, 1975. The Court is convinced that BNO and HNB did not take any part in Maryland's decision to claim Lambert's contract funds on October 1. For that reason, the Court dismissed the case against the banks and finds that the premature calling of the notes was a link in the chain of causation triggered by Maryland.
Other evidence, including documentary evidence, completely supports the conclusion that Maryland planned its action without either the Banks or Lambert knowing what it had in mind. In a memorandum dated August 25, 1975, to John Lewis, Price Hayden said (P-m-6).
"We can, at anytime we desire to, discontinue Lambert's operation, go ahead and cease further suretyship and also cease to advance money."
The term "advance money" referred to an agreement which had been reached just 5 days before, on August 20, whereby Lambert would be able to request cash from Maryland on bonded jobs. As security for these advances, Lambert pledged the expected settlement funds which all parties anticipated from the Department of Highways.
On this issue, the Court finds that Lambert had several outstanding claims against the Department of Highways which exceeded some $13,000,000. Sometime prior to August of 1975, the Department indicated that it would settle by paying Lambert $2,000,000 and such an offer was communicated to Lambert's attorneys. It was Lambert's feeling that the claims were worth more and he was not inclined to accept the settlement offer. Lambert's attorney, in an opinion letter to the Lambert's Certified Public Accountant, stated that he felt the claims were worth $6,000,000 and could be settled for "at least half." Accordingly, Lambert began negotiations for a better settlement and at one point, met with Governor Edwin Edwards and indicated his dissatisfaction with the offer.
In the meantime, Lambert needed the money, and instead of accepting a low settlement offer, negotiated an agreement whereby Maryland agreed to advance his company up to $2,000,000 while he concluded his negotiations. That agreement was reduced to writing on August 20, 1975. Maryland contends that it was not an "agreement" and that their decision not to fund under the August 20 letter was therefore not a breach of contract. The Court does not feel compelled to make a finding on this legal point, because Maryland's other actions were far more damaging to Lambert. As a matter of fact, however, the Court is convinced that Lambert relied on Maryland's actions in inducing him to sign the August 20 letter as if Maryland had "agreed" to fund the $2,000,000 while he negotiated a better settlement. As evidenced by the August 25 memo, as well as other documents, Maryland obviously had plans other than fully funding the $2,000,000 referred to in the August 20 letter.
Although the letter contemplated re-payment in January of 1976 (and presumably contemplated that January of 1976 would be Lambert's deadline for negotiating a better settlement), Maryland, during the *764 summer of 1975, began to urge Lambert to accept the $2,000,000 dollar offer. Considering past mutuality and cooperation between the parties, Lambert had no reason to believe that his failure to accept the offer was crucial to future cooperation, for no demand or ultimatum by Maryland was made. Instead, Maryland moved furtively and secretively.
Governor Edwards testified at trial and acknowledged that he considered the State's exposure to be about $6,000,000. He further stated that, after becoming acquainted with all facts, he undertook to negotiate the claims personally. The Governor testified that he met with Lambert and that Lambert would not take $2,000,000. The Governor felt that the State would benefit by the settlement of a $6,000,000 exposure for less than $6,000,000 and accordingly, the Governor was considering raising the offer when Maryland laid claim to the Lambert contract funds on October 1, 1975.
The Court does not have to speculate as to how high the State would have gone in order to settle with Lambert, because certain things stand clear: the estimate by Lambert's attorneys that the cases could be settled for at least $3,000,000 was reasonable. More importantly, had Lambert known that Maryland did not intend to complete funding under the August 20 letter, and had Lambert known that Maryland was planning a "takeover" in August and September, he could have settled for the $2,000,000 that was on the table before October 1, if not slightly more; moreover, Lambert was denied the right to seek alternative financial relief.
The Court does not rely on Price Hayden's August 25 memorandum alone in reaching the conclusion that Maryland was secretly making plans and not letting Lambert or the Banks know what it had in mind. Other documents support that finding: On August 27, 1975, John Long wrote John Lewis and asked him to keep the preparation of "letters of assignment" confidential (P-m-3).
On September 2, 1975, John Long wrote to John Lewis as follows (P-m-5).
"As soon as we get copies of applications containing the indemnity agreements, Mrs. Berkett will prepare the assignment letters on Maryland stationery for my signature.... Mrs. Berkett said we could move into the premises and get injunction proceedings if anyone tries to interfere."
It is interesting to note that in this and other pre-October 1st memoranda, the letters served upon the various governmental agencies were referred to by Maryland's own people as "assignment" letters and not as notices of "subrogation rights" as these documents are described in later legal briefs. The Court finds that the letters were assignment letters which required Lambert's signature in order to be valid. The letters eventually signed by John Lewis of Maryland are almost parallel to the letters prepared for Lambert's signature in late 1974.
Maryland's decision to keep its takeover plan a secret, to lull Lambert into a false sense of security by leading him to believe that it would fund the August 20 letter while he negotiated with the State, while planning to make claims to the contract funds and thereby put Lambert out of business was tortious and a violation of the surety's duties not to act in a manner prejudicial to its principal. The words of Maryland's Fred Dudeck"for this dedication, we owe him our every consideration"were forgotten.
Nonetheless, Maryland claims that the agreements are the law of the case and that it had the right to assert a claim to the funds on October 1, 1975, and that this right came from language in the indemnity agreements and from certain provisions contained in the May 31, 1974, agreement signed by the Lamberts. The specific language relied upon in the indemnity agreement reads as follows:
"In the event of claim or default under the bond(s) herein applied for, or in the event the undersigned shall fail to fulfill any of the obligations assumed under the said contract and bond(s), in the event of *765 claim or default in connection with any other former or subsequent bonds executed for us or at our instance and request, under the contract covered by the bond(s) herein applied for, shall be paid to the Companyand this covenant shall operate as an assignment thereof and the residue, if any, after reimbursing the Company as aforesaid, shall be paid to the undersigned after all liability of the Company has ceased to exist under the said bond(s), and the Company shall at its option be subrogated to all rights, properties and interest of the undersigned in said contract, or contracts...."
Maryland does not now argue that Lambert had "defaulted" under the bonds; but rather, that "claims" were made on certain bonded jobs, thereby triggering an assignment of all contract funds. The "claims" were allegedly in the form of certain letters of demand, liens and suits filed on certain jobs. Maryland failed to present the demand letters and the Court only has hearsay testimony by John Long as to those. As to liens and suits, Lambert testified that on many liens, there were disputes, and that these were therefore litigated with Maryland's approval and defended at Lambert's expense.
Lambert's acknowledgment of the validity of certain accounts payable was made for the simple purpose of assuring Maryland that the funds received under the August 20, 1975 letter were used to pay material suppliers. In no fashion can such action by Lambert be construed as a "default" or "claim" under the bonds issued by Maryland.
Taken on its face, Maryland's position is that any "claim", in the form of a lien, demand letter, suit or otherwise, would trigger an automatic assignment of all contract funds, no matter how small the claim, how frivolous the suit, or how large the contract funds allegedly assigned. The Court does not construe the law to be that way. Nor does the Court believe, as stated before, that Maryland did what it did because it was concerned over liens. In any event, the Court has the aid of at least one independent observer, Kenner City Attorney Vondenstein, whose letter to Maryland is in evidence: (P-0-27)
"Apparently, your position is that Maryland Casualty Company has an assignment of all project funds. The only evidence the City of Kenner has of an assignment is an undated application for contractor's bond which purports to contain an assignment of project funds upon the happening of certain events, such as a claim or default, etc."
"... However, if you expect receipt of project funds far in excess of outstanding claims against the projects, the City of Kenner will probably require a specific assignment of those funds to be executed by the contractor."
The Court agrees with these observations and does not find that the mere filing of liens triggers an unconditional and unlimited assignment of all contract funds on all jobs (which is what Maryland claimed on October 1). Further, the Court finds that none of these liens or claims were reduced to liquidated obligations against the surety, requiring the surety to perform or pay. The evidence showed that upon the filing of any such claim, Lambert would write to Maryland requesting that the lien be bonded out by a separate lien bond (thereby removing the lien as a claim against the contract bond) and advising Maryland that he (Lambert) would undertake the expense of Maryland's defense and would indemnify them against any losses. Maryland, in all such instances, acquiesced and agreed, content to leave to Lambert the defense and obligation of payment, should such an obligation occur. Maryland's theory that liens filed triggered the right to "seize" contract progress payments is untenable in law. The Court finds that it is a theory formulated after the events transpired in order to establish some legal basis, even if tenuous, to support Maryland's actions of October 1, 1975.
Without obligations to perform or pay, the bonding company has no rights to contract payments. This was the holding of the Fifth Circuit in Fidelity and Deposit *766 Company of Maryland v. Scott Bros. Construction Co., 5th Cir., 461 F.2d 640:
"The Court made it clear that default occurs either when a contractor declares default or when it materially fails in contract performance:
`What matters, however, is that F & D had no obligation to begin performance under its bond with Scott, and thus no rights to contract payments as subrogee, until Scott either stated that it could no longer continue on the job or until Scott materially failed in its performance.
Lambert clearly did not fall into either category cited by the Court of Appeals in Scott, and the Court accordingly finds that Maryland had no right to those funds under the default provisions of the indemnity agreement. The Court is also convinced from the evidence that Maryland knew it had no rights without a specific assignment, for if a specific assignment was not required, why was one sought by Maryland? Additionally, Maryland waived any rights to assignments by agreeing that Lambert's refusal to execute assignment documents was mutually acceptable. When Maryland's actions caused the banks to call over $4,500,000.00 in notes for payment within 24 hours, Lambert sought relief in the form of a Chapter XI petition filed in Bankruptcy Court on October 14, but by then the company was effectively destroyed.
A second document by which Maryland claims the right to the contract funds is the May 31, 1974, letter signed by Lambert and addressed to Maryland. Since Maryland did not sign the letter, there is a question in the Court's mind as to whether it is actually a bilateral "agreement," supported by mutual consideration, or a letter of intent, indicating an intent to give consideration at a later date (security devices) for funding to be given at a later date (the BNO new debt and extension of the BNO credit). The first paragraph of that letter speaks of certain things Lambert wanted BNO and Maryland to do, but doesn't bind BNO or Maryland to do them.
But for reasons given below, the Court does not feel compelled to struggle with this legal question.
First, the letter clearly contemplated that Lambert would "execute, when called upon by Maryland, whatever documents may be required to evidence to third parties the effectiveness of the assignment." "The assignment" spoken of was the conditional assignment contained in the indemnity agreement. Lambert lived up to his obligation to execute assignments when called upon to do so on August 5, 1974. However, when specific assignments were tendered in December or January of 1975, Lambert refused to execute and called Price Hayden of Maryland, who withdrew the request for the assignments. Lambert's refusal was based, at least in part, on the ground that such assignments were not called for under any agreement. Maryland obviously conceded the point.
But even if the court were to accept without reservation Maryland's position that the May 31 letter gave Maryland assignment rights, Maryland went too far. The language in that letter, prepared by Maryland, recognizing that assignments contained in indemnity agreements are "now executory" applies only to those indemnity agreements "heretofore executed by Lambert." "Heretofore," according to Webster, means "up to this time," and accordingly, even if the Court were to accept the Maryland interpretation of the language "now executory," such language could apply only to those jobs on which indemnities were executed before May 31, 1974.
Lambert executed many indemnity agreements after May 31, 1974, including one Kenner job, six Highway department jobs, all four Jefferson Parish jobs, one Gretna job and the Nicholls State project. On eight additional jobs, where bonds were executed prior to May 31, and (theoretically) the "heretofore executed" language may have applied, the State had accepted the work. Nevertheless, Maryland laid claim to all these funds. Certainly, Maryland had no rights under the May 31st letter to contract funds on jobs bonded after May 31st.
*767 The Court finds that Maryland's overreach was unlawful and caused the Lamberts irreparable and foreseeable damage.
Before moving to the issue of damages, the Court must make further comment on Maryland's use of two consultants, Louis Pugh and Gilbert Jones. Pugh and Jones were apparently brought in [by] Maryland as "engineering consultants" to oversee Lambert's operation. Lambert cooperated with them as he did with Mr. Hildebrandt. Pugh and Jones, however, were not engineers. Moreover, Lambert testified that Pugh approached him with hints of graft, and that he rejected the suggestions and merely told Pugh that he would cooperate with him in anything he needed in the form of accounting information, job progress reports, etc. Pugh and Jones did not testify at trial and Maryland made no effort to rebut Lambert's allegation that Pugh made the proposal. The inference that Pugh and Jones were less than honest permeated the trial. If they were not dishonest, they were clearly without the necessary qualifications or expertise to make any meaningful evaluation of the Lambert corporation. The Pugh report was prepared in stages in August and September of 1975, and was deliberately withheld from Lambert and BNO and the Hibernia Banks. His report was nothing less than a plan for taking over Lambert's Company, re-letting the contracts and liquidating the assets.
Originally, Lambert alleged that there was a conspiracy which included Pugh and Jones whereby Pugh and Jones would re-let the contracts at prices high enough to allow kickbacks to Pugh, Jones and others. That conspiracy issue was part of Lambert's anti-trust cause of action, which the Court dismissed. For this reason, and because the Court advised the parties at pre-trial that it would not allow evidence on Lambert's allegation of conspiracy, no proof was presented on that point.
Lambert did prove, however, that Pugh and Jones were incompetent. By the testimony of a private investigator hired by Lambert to look into the backgrounds of Pugh and Jones in New York, it was established that they were not engineers, that Pugh ran a bar and lounge and did only limited construction work, and that Jones manages a Greyhound bus station. Neither had an engineering degree of any kind nor any experience in highway construction work. In fact, at least one person in Maryland's organization had doubts. On August 18, 1975, John Long reported that a Mr. Morgan had raised questions about the hiring of Pugh (P-m-2):
"... He thought that he was primarily a building contractor rather than a road contractor, therefore, was somewhat concerned about what expertise Mr. Pugh could advise us."
Maryland called a co-worker of Pugh and Jones to testify and his testimony corroborates the lack of qualifications of the Maryland consultants. Maryland's selection of the Pugh group was unfortunate, but the selection was Maryland's and it is evident that the surety is wholly responsible for the activities of the consultants.
For the reasons set forth above, the Court finds that Maryland is liable to the plaintiffs for the damages it caused.
Lambert claims damages for the destruction of the value of his 100% stock ownership in Donald G. Lambert Contractor, Inc. and its related companies, as well as for his personal loss of income, past and present. The Court rejects Lambert's claim for personal loss of income, but awards the Lamberts damages for the loss of the value of their 100% ownership of the company and for the destruction of the company as a going business concern. The Court must now determine the proper measure of damages for the destruction of the business.
In determining damages, the Court finds that the Lambert Company was a "going business concern" and that it therefore had (before Maryland acted) "goodwill" or a value beyond its hard assets. On this point, the Court finds that Lambert's business was a going business concern. The Court recognizes that Lambert had cash-flow problems, but that does not mean the entity is not viable. Without interference from Maryland, the Court is convinced Lambert could *768 have settled his claims with the State for $3,000,000. BNO was willing to refinance all of Lambert's debt (with cooperation from the surety). Lambert was on the verge of completing most of his jobs, which would have released additional cash from retainages held by the State and others. Lambert was held in high regard as a capable contractor by the State Highway Department. Governor Edwards testified that Lambert's presence as a competitive bidder in the marketplace would continue to save the State millions of dollars in contract awards. In essence, there is no doubt that the Lambert companies were a "going business" despite cash-flow problems, which the Court attributes to an unusual business climate, weather problems, unusually high interest rates in 1974, the oil embargo and disputes over money due Lambert by the Department of Highways.
Lambert presented two experts, an economist and a securities broker. Maryland countered this evidence with a securities analyst of its own. Louis Wolfson, an economist, analyzed the value of Lambert's stock interest under several approaches. Under one approach, he assumed that Lambert was the driving force, or the "alter ego" of Donald G. Lambert Contractor, Inc. and using accepted work-life expectancy tables, limited the corporation's life to Lambert's own work-life expectancy. Over the span from 1966 through 1974, the Lambert Company reported an average income of $407,000.00 per year. Using this approach, the economist felt the company was worth $14.4 Million. The economist made the adjustments for inflation and used a discount theory for an aggregate cash evaluation. The Court finds this approach helpful. A more liberal approach referred to as the "per-cent of revenue" approach was also given by Lambert's economist. Under this approach, the company's value was computed at $25,600,000. The Court had difficulty with the analysis and, exercising its discretion, simply rejects same.
Lambert presented a securities broker from E. F. Hutton who was asked to determine if there was a ratio between a company's tangible assets and its acquisition price, and if so, what that ratio was. The market setting was the year 1977, which was an unfavorable market for sellers. The market analyst through his research, found approximately 16 companies whose stock was purchased through acquisition or merger. Using statistics, the witness indicated that the average ratio between assets and stock value was 2.14 (considering the companies the witness analyzed). The Court found this helpful since it is convinced that a going concern had real, if intangible, "goodwill" value. Independently, the Court has struggled with this issue and under the circumstances of this case, the Lambert company had an intangible value for which a willing buyer would have paid. That intangible value which is measured in dollars above asset value is the "goodwill" of a company, or its value as a "going business concern" and it is real. It includes the reputation of the firm, its experience, its work force already amassed, and the value of the years it took the company to grow. The Court feels that a willing buyer will pay for that intangible asset and the Court finds that the method of measuring that item of damages by Lambert's market analyst was reasonable. In fact, when compared to evidence adduced during the cross-examination of Maryland's analyst, Lambert's analyst was conservative.
Plaintiffs, in brief, urge the Court to apply the asset-to-value ratio of 2.14 to the value of Lambert's equipment, which was worth $6.4 Million in June of 1974. Such an approach would value the stock at $13.7 Million. The Court, however, considers the "net worth" of the Lambert interest in the various consolidated companies to be the proper factor and will use that figure, which was based on the latest complete report available from the CPA was $6,256,624.00. From that base, the Court must make further adjustments. The Court finds that Donald G. Lambert contractor would have suffered a net loss in fiscal 1975 of $1,680,000.00. Lambert Industries would have had a net operating profit of $34,000.00 for a consolidated operating loss of $1,646,000.00. This figure was not audited, *769 nor even reduced to a report, because Maryland's Pugh and Jones were using Lambert records in September and October of 1975 and thereby precluded Lambert's CPA from finishing his work. However, charts prepared by Maryland, based on work papers indicate that the corporations would have suffered these operating losses. The Court will accordingly further adjust the net worth figure downward by those losses in order to arrive at a 1975 net worth of $4,610,625.00. Subject to those downward adjudgments, the Court feels that this approach is the most reasonable, and the most conservative, and applying to the goodwill factor of 2.14, finds that the value of the company was $9,866,737.50, before Maryland's wrongful acts. After October 1, the company was no longer viable and the stock became worthless.
In the net worth value of the consolidated Lambert corporations as of the end of the audited fiscal year of 1974 is included all of the new debt. The only other debt of any magnitude occurred subsequent to August 20, 1975, when Maryland advanced Lambert's primary corporation about $1,100,000.00 (prior to October 1, 1975). This figure is off-set by two factors. Lambert used the money, at least in part, to pay past due accounts payable. Moreover, the amount due Lambert's primary corporation from the various government agencies for progress payments was greater than his incurred liability. The Court has therefore, resolved a balance sheet figure of net worth in Maryland's favor.
Maryland presented a market analyst, Black Chaffe, to rebut Lambert's analyst. Maryland's approach was to show that a decline in cash-flow in the Lambert company in fact had made the stock of the corporation worthless. On direct, Maryland's analyst concluded that Lambert's company was worthless and the stock would be worth zero. The Court rejects this opinion. The premise that cash-flow shortages equal no-worth was dispelled when, on cross, Maryland's expert admitted that his own brokerage firm had taken many companies with severe cash-flow shortages and sold them for several times their asset value. The examples posed on cross-examination included companies which had cash-flow records similar to Lambert's, if not worse. Yet, when the corporation's stock was put up for sale in a public offering, the buyers paid well over tangible assets. The end result of the testimony of Maryland's expert was that, as to the companies presented as examples, the ratio between tangible assets (per share) and sales price (per share) was 5.26. Using this statistic, the approaches by Lambert's witnesses were conservative. Moreover, Maryland's analyst used book value amounts rather than real value. Book value is a fiction used primarily for tax purposes. Real value is exactly that, real value, and not a formula value used by accountants to assess depreciation and tax liability.
Mr. Wolfson's approach, concluding that Lambert's stock was worth over $14,000,000, was reasonable, but must be examined in light of other facts. He did not consider losses which took place following the end of the Lambert fiscal year in 1975 nor did he make any attempt to independently assess the real value of [the litigious right Lambert had against the State of Louisiana and heavy losses in 1975, the Court finds that these losses were extraordinary and unusual and although they must be (and have been) considered, they should not be given any greater weight than extraordinary gains. The 1974-75 losses did not render the Lambert company worthless. The claims against the State of Louisiana had a minimum value of $3,000,000 if the Lambert company was operative. The Court finds that the Governor of the State was clear and unequivocal in this position. He wanted these claims against the State settled, for the best interests of the State of Louisiana. These claims are now in dormant litigation in another jurisdiction of the State and may still have some value. However, the Governor made the point that Lambert's survival was important to maintain competition in the State and a settlement of $3,000,000 was contingent on this factor. When events took the Lambert company out of the market place, these *770 considerations ceased to exist. The claims were therefore subject to the uncertainty of some future trial or trials and the State no longer has the same incentive to settle as it did when Lambert was viable. The Court finds that the claims still have some residual value, but that this value is far less today than on or prior to October 1, 1975, the date of Maryland's unlawful actions. Of course, no one can guess as to the residual value of the claims, and that issue is one which must await future adjudication. Maryland did, however, create this problem by its own actions, and this Court finds that, for all intents and purposes, the claims have lost their value. If they have value, Maryland would, in this Court's opinion, be entitled to intervene and collect that value as the "salvage" value of the corporation, should Lambert decide to prosecute them. He clearly has no obligation to do so, for such prosecution of law suits is not within this Court's view of any obligation owed by Lambert.
Accordingly, the Court awards Donald G. Lambert and Sharon W. Lambert the sum of $9,866,739.50 in damages plus interest from date of judicial demand against defendant, Maryland Casualty Company.
GRETNA, LOUISIANA, this 20th day of September, 1978.
 /s/ Floyd W. Newlin 
 JUDGE
KLIEBERT, Judge, concurring.
The district court found wrongful conduct under Louisiana Civil Code Articles 2315 and 2316 and a breach of the contractual-quasi-contractual relationship between the parties. Accordingly, it rendered judgment in favor of the plaintiffs, Donald G. Lambert, et al for $9,866,739.50 with legal interest from judicial demand and all costs. The majority opinion in this court concluded the plaintiffs should not be allowed to proceed individually as shareholders to recover for damages allegedly caused by the defendant Maryland to the bankrupt corporation. Due to the incompleteness of the jurisprudence, its conclusion on the merits, and the size and complexity of the problem presented, it went on to decide the case on its merits. It reversed the district court and dismissed the plaintiffs' suit.
I concur in the majority view that plaintiffs have no right to proceed directly as stockholders for injury done to the corporation. In my view, however, there is an individual and separate cause of action in favor of the individual plaintiffs and it is this individual cause of action to which I address this opinion.
In the majority's view, the crux of the case turned on the interpretation placed in the agreement entered into on May 31, 1974 between Maryland, the bank, the Lambert Corporation and the Lamberts individually. The majority concluded an assignment had in fact been made to Maryland on May 31, 1974. Since Maryland had a valid assignment of the proceeds due under the contracts, the majority concluded it had a legal right to inform the project owners of the assignment and to claim the proceeds due under the contract; hence, Maryland cannot be held liable. In reaching this conclusion, the majority considered the relationship between the corporation as the principal and the defendant, Maryland, as the surety. It paid little or no heed to the relationship created between the plaintiffs as individuals and Maryland arising out of the plaintiffs individually joining into the agreement of May 31, 1974.
As may be noted from the application for a contractor's bond, in addition to the indemnification agreement from the corporation as principal, Maryland required an indemnification or guarantor's agreement from Donald Lambert, et ux, individually. In early 1974, the corporation commenced having serious financial difficulties. At that time, Maryland Casualty had an exposure on performance and lien bonds in excess of $25 million. Any default by the corporation would result in loss to Maryland and, to the extent it was not recoverable from the corporation, would be recoverable from Donald Lambert et ux as guarantors. It was in that setting the agreement of May 31, 1974 was entered into.
In commenting on this agreement, in Lambert v. Cronvich, 373 So.2d 554 (La. App. 4th Cir. 1979), this court said (at 558):

*771 "... we note simply that the Lambert Corporation was indebted under various loans from the Bank of New Orleans and The Hibernia Bank in excess of $2,000,000. Maryland had considerable exposure on a number of public works contracts in which it acted as surety for the corporation, and which held some danger of inability of completion. In order to keep the corporation active, Maryland agreed that it would guarantee an additional loan of $2,000,000 to be made by the Bank of New Orleans for Lambert's account, and Lambert, [as here used Lambert means the individuals and the corporation] on its part was required to furnish collateral surety of basically every asset the corporation and the individuals had. The agreement further pointed out the method by which payments were to be allocated amongst the new debt and the old debt as well as the debtors' interest...."
It was to the mutual benefit of Maryland and Lambert, et ux, individually, to maintain the corporation's ability to perform on the contracts. Each performance by the corporation reduced Maryland's exposure on the surety agreements. The same performance reduced Lambert's individual exposure as Maryland's guarantor under the indemnifying agreement.
As stated by a surety lawyer and quoted by the trial judge from a legal periodical "2 Public Contract Law Journal," 79 at page 83 (1968), Maryland's ability to control the manner and method by which the corporation performed was limited as follows:
"The surety is under a dutyand this is not well understood by obligeesnot to commit an act prejudicial to the rights of its principal. The bond application agreement is not a contract of `peonage' and it does not establish a `master-servant' relationship between the surety and its principal. The surety is not the alter ego of its principal and the surety does not have unilateral power to issue orders or directives to its principal on how and when to perform the construction contract. The obligation, prior to default, to perform work and pay accounts belongs exclusively to the principal. The surety will not, therefore, intervene in disputes between the principal and third parties in advance of a default by the principal of its obligations. This does not mean that the surety is without remedies against a misbehaving principal who is not yet in default. In extraordinary circumstances, where the surety has just cause to believe that its rights as surety are being imperiled by the conduct of its principal, such as by diversion of jobs, funds, unpaid job accounts in large sums and unsatisfactory job progress, the surety may, in advance of an announced default, bring an action quia timet against its principal to compel correct conduct." (Emphasis Supplied).
On the other hand, Lambert, as the owner of the corporation, as its chief executive officer, had the authority to direct the performance of the corporation. Thus, there was ample and good reason for some of the rights and assets of each to be pledged for their mutual benefit under the agreement of May 31, 1974.
In the May 31, 1974 agreement, Maryland agreed to guarantee the additional loans by the bank in return for Lambert, individually and the corporation, pledging additional assets (corporate and individual) and the corporation agreeing to assign proceeds due under the contract to Maryland. Maryland was under no obligation to perform or do more to bolster the corporation's ability to perform. Nevertheless, on or about August 20, 1975, for the same reasons it made the May 31, 1974 agreement and bolstered by the idea that the corporation had a claim against the State worth at least $2 million, Maryland made further advances to the corporation.
Under the agreement, the corporation, operated by Donald Lambert, with consultations by Maryland, [as would be done under a pure surety-principal relationship] continued to do business and reduced the potential exposure under the unfinished contracts from $25 million to $9 million without being placed in default on a single project.
*772 At that point, a year and a half after the May 31, 1974 agreement had been entered into, Maryland elected to inform the project owners of the assignment to it by the corporation and to demand payment of same to it. As would be anticipated by anyone taking the action, the project owners ceased paying the corporation pending a determination of whether the funds belonged to Maryland or the corporation. It is this act which Donald Lambert individually complains of and is the act for which the trial court imposed liability on Maryland.
Maryland defends Lambert's complaint on grounds the May 31, 1974 agreement gave it a valid assignment of the proceeds due on the ongoing contracts and, hence, the legal right to take the action complained of. Counsel for Maryland argues it paid two million dollars for the assignment and, hence, had the right to exercise it for any reason and at any time it saw fit. The majority opinion concluded Maryland had a valid assignment under the May 31, 1974 agreement and accordingly, a legal right to inform the project owners of the assignment at any time it saw fit to do so. It is this conclusion which causes me to part company with the majority.
The question in my mind is not whether Maryland had a right to do what it did, but rather, why did it do what it did? Nowhere in the record is there an explanation by Maryland as to why it took the action it did at the time it did. Donald Lambert testified that at the time he was called for the meeting at which he was informed Maryland would take the action complained of, he actually believed the financial condition of the corporation had improved so substantially that he believed the purpose of the meeting was to give him longer terms or extensions on bank notes that would become due in November.
The record reflects that after the potential exposure of Maryland was reduced to a point where the assets of the corporation and the individual assets of Lambert, coupled with the claim against the state was apparently sufficient to assure Maryland of little or no losses, Maryland lost interest in bolstering the corporation's ability to perform. It made demands on Lambert to settle its claim with the State and to sell equipment not needed to complete the unfinished projects. Lambert refused. Then Maryland took the action here complained of. Thus, raising the question in taking this action, was Maryland acting in furtherance of its agreement with Lambert individually or for the purpose of saving itself at the expense of Lambert individually?
Having entered into an agreement where each party took additional risks and committed assets not previously committed to bolster the corporation's ability to perform for the mutual benefit of itself and Lambert individually, in my view, Maryland was duty bound not to take an action prejudicial to Lambert individually. I compare this duty to that owed by an insurer to its insured when the insurer holds the authority to compromise a third party's liability claim. Where an insurer was arbitrary or in bad faith in settling a claim and this results in injury to its insured, the insurer is liable in damages. Roberie v. Southern Farm Bureau Cas. Ins. Co., 250 La. 105, 194 So.2d 713 (1967); Cousins v. State Farm Mut. Auto. Ins. Co., 294 So.2d 272 (La.App.), writ refused, 296 So.2d 837 (La.1974); Younger v. Lumbermens Mut. Cas. Co., 174 So.2d 672 (La.App.1965); Ward v. State Farm Mut. Auto. Ins. Co., 539 F.2d 1044 (5th Cir. 1976).
Maryland knew or should have known that informing the project owners of the assignment by the corporation to Maryland would result in the project owners terminating further payments under the projects to the corporation. Without those payments, the corporation could not operate and would be put into default by the project owners. As I read the record, Maryland took the action it did to immediately cause a default and thereby place itself into complete control of the corporation and its assets. In so doing, it violated its duty to Donald Lambert individually. Therefore, the merits of the case should be decided because Lambert individually had a cause of action against Maryland, separate and apart from that of the corporation.
*773 Since Maryland violated the duty it owed to Lambert individually, the next question to consider is whether the violation by Maryland caused or played a substantial part in bringing about Lamberts' loss of personal assets. Stated another way, would the corporation have survived and Lamberts' personal assets been saved if Maryland had not caused the default, but simply refused to extend further funds or guarantee additional loans to Lambert?
If the answer to the foregoing is in the affirmative, then Lambert individually, would be entitled to recover for the loss of all his personal assets except for the loss of the value of the corporate stock. Loss of value of corporate stock would not be recoverable by Lambert individually because the corporation itself would be the proper entity having a right of action to enforce that particular element of loss.
In order for Maryland's conduct to be a cause in fact of Lambert's individual harm, it must be shown to be a substantial factor in causing plaintiffs' injury. Some direct relationship is required between the conduct complained of and the resulting injury. The conduct must be a necessary ingredient of the resulting injury and the injury must be the natural, probable and foreseeable consequence of the conduct. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Laird v. Travelers Ins. Co., 263 La. 199, 267 So.2d 714 (1972); Jones v. Robbins, 289 So.2d 104 (La.1974); Ducote v. Voorhies, 350 So.2d 1289 (La.App. 3rd Cir. 1977).
Maryland was under no obligation to extend further funds or guarantee further loans. Therefore, Maryland could have simply refused to guarantee loans or provide cash to Lambert and suffer no legal ramifications for said refusal. Since Maryland had no obligation to provide Lambert with cash, the question becomes, would the corporation have been placed into default by the project owners if Maryland had not acted the way it did at the time it did?
Although Maryland violated its fiduciary relationship to the Lamberts individually, if its violation was not the cause in fact of the Lamberts' loss of individual assets Maryland would have no liability. The record is insufficient to establish causation or the extent of Lamberts' individual loss. For that reason, I concur with the majority decision to set aside the trial court judgment; but, instead of dismissing the plaintiffs' case, as done by the majority, in my opinion the case should be remanded for the introduction of additional evidence on causation and the individual loss sustained by Lambert.
NOTES
[1] Whenever the word "plaintiff" is used in this opinion in the singular, it refers to Donald G. Lambert.
[2] The record indicates the corporation's financial condition had grown worse following the BNO loan and it had lost $1,097,000 in the first five months of 1975.
[3] See footnote 2.
[4] Hibernia also was given certain rights to share in the additional collateral given to BNO and Maryland in May, 1974.
[5] Approximately $685,000 was advanced under this agreement after October 1, 1975.
[6] 11 U.S.C. §§ 701-799.
[7] 11 U.S.C. §§ 501-676.
[8] Bank of New Orleans & Tr. Co. v. Lambert, La.App., 373 So.2d 550, and Lambert v. Cronvich, La.App., 373 So.2d 554, both handed down April 10, 1979.
[9] See Bank of New Orleans & Tr. Co. v. Lambert, La.App., 373 So.2d 550.
[10] Scurlock Oil Company v. Getty Oil Company, La., 294 So.2d 810; McKean v. Campbell, La.App., 372 So.2d 652; New Orleans Mortg. Co., Inc. v. City of Kenner, La.App., 362 So.2d 1217.
[11] McKean v. Campbell, La.App., 372 So.2d 652, 654; see also McNeal v. State Farm Mutual Automobile Ins. Co., La., 278 So.2d 108; Olsen Engineering Corp. v. Hudson Engineering Corp., La.App., 289 So.2d 346.
[12] La., 340 So.2d 287.
[13] Supra, note 10, at page 819.
[14] Maryland also contends that in several instances in brief plaintiffs argue the reconventional demand and the present suit assert the same cause of action. However, our reading of plaintiffs' various briefs reveals the term was used in a loose sense in connection with other matters.
[15] La.App., 307 So.2d 399.
[16] The basis for this court's reasoning was the case of Texas Industries, Inc. v. Dupuy & Dupuy & Dupuy Develop., Inc., La.App., 227 So.2d 265, which recognized the distinction between a corporation and its shareholders and stated that a corporation's shareholders cannot be sued for a corporate debt unless there is mistreatment of corporate affairs sufficient to justify piercing the corporate veil.
[17] 171 La. 176, 129 So. 810.
[18] See Weber v. Bon Marche Pharmacy, Inc., La.App., 378 So.2d 520.
[19] 24 F.2d 378 (2 Cir.).
[20] 275 F.Supp. 712 (D.C.).
[21] See footnotes 15 and 17, supra.
[22] See, e.g., Balis v. Mitchell, La.App., 48 So.2d 691.
[23] Maryland so argues in brief.
[24] See footnote 8, supra.
[24A] This position is questioned as overly narrow since the indemnity agreements state that the assignments will become effective "in the event of claim or default."
[25] La.App., 7 So.2d 751.
[26] See also R.S. 10:3-304(4)(b) which refers to executory promises in the context of defenses or lack of defenses to negotiable instruments.
[27] Bouvier's Law Dictionary (3rd rev.8th ed.) defines "executory" as "whatever may be executed,as, an executory sentence or judgment." Webster's International Dictionary gives as its main entry "... operative, being in effect, putting into effect."
[28] 198 La. 1062, 5 So.2d 335.
[29] Supra, note 8.
[30] 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412.
[31] This opinion was expanded in Henningsen v. U. S. Fidelity & Guaranty Company, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547, in which the Supreme Court held a surety is not only subrogated to the contract balances necessary to complete construction, but also to the balances if the surety was required to pay laborers and materialmen whose claims were guaranteed by the payment portion of the bond.
[32] 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190.
[33] 40 F.2d 577 (5 Cir.).
[34] 557 F.2d 482 (5 Cir.). See also Natchitoches Sweet Potato Co. v. Perfection Curing Co., 153 La. 916, 96 So. 808; Times Picayune Pub. Co. v. Russell Construction Co., La.App., 139 So.2d 573; Lennox Industries, Inc. v. Pitcher Company, La.App., 209 So.2d 507. Other state court decisions are Hartford Accident & Indemnity Co. v. Long, 245 A.2d 800 (Del.Ch.); Argonaut Insurance Co. v. C & S Bank of Tifton, 140 Ga.App. 807, 232 S.E.2d 135; First Vermont Bank & Trust Co. v. Village of Pultney, 134 Vt. 28, 349 A.2d 722; Canter v. Schlager, 358 Mass. 789, 267 N.E.2d 492; Trinity Universal Insurance Co. v. Bellmead State Bank, Tex.Civ. App., 396 S.W.2d 163; Jacobs v. Northeastern Corporation, 416 Pa. 417, 206 A.2d 49; Levinson v. Linderman, 51 Wash.2d 855, 322 P.2d 863; Scarsdale Nat'l. Bank & Trust Co. v. U. S. Fidelity & Guaranty Co., 264 N.Y. 159, 190 N.E. 330; and State v. Schlesinger, 114 Ohio St. 323, 151 N.E. 177, 179. Other federal court decisions are Martin v. Nat'l. Surety Co., 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822; Great American Ins. Co. v. U. S., 203 Ct.Cl. 592, 492 F.2d 821; Home Indemnity Co. v. U. S., 193 Ct.Cl. 266, 433 F.2d 764; Fireman's Fund Ins. Co. v. U. S., 190 Ct.Cl. 804, 421 F.2d 706; Nat'l. Shawmut Bank of Boston v. New Amsterdam Cas. Co., 1st Cir., 411 F.2d 843; In Re Dutcher Const. Corp., 2nd Cir., 378 F.2d 866; Home Indemnity Co. v. U. S., 180 Ct.Cl. 173, 376 F.2d 890; Standard Accident Ins. Co. v. Federal Nat'l. Bank, C.C.A., 112 F.2d 692; Farmers' Bank v. Hayes, C.C.A., 58 F.2d 34; Lacy v. Maryland Cas. Co., C.C.A., 32 F.2d 48; Travelers Indemnity Co. v. West Georgia Nat'l. Bank, 387 F.Supp. 1090; American Fidelity Fire Insurance Co. v. Construcciones Werl, 407 F.Supp. 164.
[35] First Ala. Bank, etc. v. Hartford Acc. & I. Co., 430 F.Supp. 907.
[36] Id.
[37] E. L. Burns Co., Inc. v. Cashio, La., 302 So.2d 297.
[38] R.S. 38:2241. Failure of either is a default on the bond.
[39] This evidence was in the record by way of an offer of proof. It should have been admitted into evidence.
[40] 297 N.Y. 694, 74 N.E.2d 226.
[41] 8th Cir., 520 F.2d 790.
[42] 190 Ct.Cl. 804, 421 F.2d 706.
[43] American Fidelity Fire Insurance Co. v. United States, 206 Ct.Cl. 570, 513 F.2d 1375; Great American Insurance Company v. United States, 203 Ct.Cl. 592, 492 F.2d 821; Home Indemnity Company v. United States, 180 Ct.Cl. 173, 376 F.2d 890; National Surety Corporation v. United States, 319 F.Supp. 45.
[44] The record contains some evidence indicating the Lambert interests were notified only July 31, 1975 that Maryland would not continue to write public works bonds for the corporation.
[45] Cueto-Rua, "Abuse of Rights", 35 La.L.Rev. 965 (1965).
[46] Stone, Tort Doctrine, 12 La.Civil Law Treaties, § 261 (1977).
[47] 145 La. 233, 82 So. 206.
[48] 173 La. 375, 137 So. 67.
[49] Plaintiffs also cite three other cases in support of Louisiana adoption of the abuse of rights theory. In Fassett v. United T.V. Rental, Inc., La.App., 297 So.2d 283, the court refused to recognize a provision in a television rental contract irrevocably authorizing the lessor to enter into the debtor's residence without judicial authority or without the owner's consent to repossess a rented television set. The court rendered judgment in tort, holding in effect that the contract clause was against public policy. The case does not tend to stand for the abuse of rights doctrine since the court held the defendant did not have a right which it could abuse. Plaintiffs also cite Hero Lands Company v. Texaco, Inc., La., 310 So.2d 93, which involved a question of strict liability under C.C. Art. 667. The issue was the statutory duty owed by neighbors and the creation of a nuisance involving an inherently dangerous instrumentality in the form of a gas pipeline. The court stated the extent of inconvenience which one neighbor must endure to benefit another depends on the facts and circumstances of each case. This decision does not involve the abuse of rights doctrine since the defendant obviously obtained some benefit from the installation of the gas pipeline, and the question involved was the extent of one neighbor's rights to inconvenience another under C.C. Art. 667. Finally, plaintiffs cite Steadman v. Action Finance Company, La.App., 197 So.2d 424, in which the court held a document purporting to be a pledge did not justify the taking of an automobile without court order or the owner's consent. This case is merely a variation of the Fassett case above, where a legal right did not exist and consequently a legal right could not have been abused.
[50] La., 344 So.2d 1353. See also Illinois Cent. R. Co. v. International Harvester, La., 368 So.2d 1009.